

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00295-CV

———————————————

IN THE INTEREST OF O.S., A CHILD

———————————————————————————————

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-569352-15

———————————————————————————————

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. Introduction

In this appeal, Appellants A.S. (Mother) and C.S. (Father) appeal the trial court's order terminating their respective parental rights to their daughter O.S. (Opal).[1]  In five points, Mother contends that the trial court failed to timely render a final order in violation of Texas Family Code Section 263.4011; that the evidence is legally and factually insufficient to support the termination of her parental rights under Family Code Subsections 161.001(b)(1)(D), (E), and (O); and that the evidence is legally and factually insufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), (E), (O), (b)(2), 263.4011.  In three points, Father contends that the trial court erred by extending the trial date beyond the deadline to render a final order imposed by Family Code Section 263.4011 and that the evidence is legally and factually insufficient to support the termination of his parental rights under Family Code Subsections 161.001(b)(1)(L) and (O).  *See* Tex. Fam. Code Ann. §§ 161.001(b)(1)(L), (O), 263.4011.  We will affirm.

---

[1]To protect her identity, we use aliases to refer to the child, her parents, and her aunt.  *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

## II. BACKGROUND

### A. Mother's Placement of Opal with a Drug User, Opal's Removal from Mother's Care, and Opal's "Very Rough" Appearance Upon Removal

In November 2022, Crystal Manners, an investigator with the Department of Family and Protective Services (the Department), was investigating a case for the Department. During the course of that investigation, Manners learned that Mother had left Opal in the care of a woman who had tested positive for amphetamine.[2] Manners contacted Mother to inform her of the situation and of her need to pick up Opal, and Mother "began to scream and yell" at Manners.[3] During the course of that conversation, Mother told Manners that she had left Opal with the other woman because Mother was homeless. Meanwhile, Father was nowhere to be found and was later discovered to be living out of state. Manners therefore obtained a court order to remove Opal from Mother's care.

Opal told Manners that Mother had previously left her home alone "from light to dark." Opal also reported a domestic-violence incident between Mother and a man, describing how "televisions were broken" and "the room was trashed" during that event. Manners later described Opal's appearance upon removal as "very rough." According to Manners, "[Opal's] skin was dry, her hair . . . was kind of a mess, she

---

[2]Opal was eight years old at the time of removal.

[3]Mother told Manners that she was not going to pick up Opal because she did not have a ride.

3

had dirt all over her, [and] her clothes didn't fit." Moreover, Opal "had a lot of scars and marks on her arms, her legs, her back, [and] her stomach," and "it appeared [that] she had some labored breathing."[4] Photographs depicting Opal at the time of removal were admitted into evidence at the termination trial. Those photographs show Opal's very thin appearance and depict numerous marks and what appear to be bruising and sores on her body.

## B. Mother's Attempts to Complete Services, Her Failed Drug Test and Drug-Test Refusals, and Her Threatening Behavior Toward the Department's Caseworkers

Ashley Cummings, a Department caseworker,[5] developed a service plan for Mother due to the Department's concerns that Mother had left Opal in the care of a drug user and appeared to be neglecting her. Mother's service plan required that she complete a parenting class, an anger management class, individual counseling, a drug and alcohol assessment, a mental health assessment, and a psychological evaluation; that she obtain stable housing and employment; and that she submit to random drug testing. Mother refused to sign the service plan, telling Cummings that she did not

---

[4]Manners testified that Opal "was sent to the emergency room" because of her labored breathing. It is unclear from the record when that emergency room visit occurred.

[5]Cummings was a permanency specialist for Our Community Our Kids, which "is a private provider of community-based care that contracts with the Department to provide foster care case management, kinship, and family reunification services in parts of the state, including Tarrant County." *In re T.D.*, No. 02-22-00215-CV, 2022 WL 11483054, at *3 n.9 (Tex. App.—Fort Worth Oct. 20, 2022, pet. denied) (mem. op.).

4

think that she should have to complete her service plan because she did not have anything to do with Opal's removal from her care.

Regardless, Mother complied with some, but not all, aspects of her service plan. Cummings later testified that Mother had completed a parenting class, an anger management class, and a psychological evaluation. Mother, however, did not complete the mental health assessment, the drug and alcohol assessment, or individual counseling. As to stability and housing, Cummings noted at trial that Mother had "struggle[d] with homelessness at the beginning of this case" but that Mother had maintained an apartment since 2023. Cummings said that Mother was not employed at the time of the June 2024 termination trial.

Cummings testified that the Department asked Mother to take a drug test each month since Opal's removal in November 2022. Cummings stated that Mother had only submitted to a drug test in May 2023. Those test results were positive for amphetamine, methamphetamine, and marijuana. Mother had not submitted to drug testing from November 2022 until the May 2023 test, and she had not submitted to drug testing from June 2023 until the termination trial. Cummings explained that when a parent does not take a drug test requested by the Department, it is presumed that the test result would be positive. Cummings also stated that Mother had been arrested during the pendency of the case "for a possession charge."

Following removal, Mother attended the majority of her weekly visits with Opal. Cummings testified, however, that Mother's supervised visits stopped at one

5

point during the case after Mother spoke "inappropriately" with Opal about the case. When redirected from those inappropriate remarks, Mother "yell[ed] and cuss[ed]" at Department caseworkers in front of Opal. According to Cummings, Mother had threatened her on multiple occasions, and Cummings did not think that Mother was able to control her behavior despite her completion of the anger management class.[6]

## C. Father's Prior Conviction for Bodily Injury to a Child, His Attempts to Complete Services, His Failed Drug Test and Drug-Test Refusal, and Allegations that He Assaulted His Pregnant Girlfriend

The Department had initial concerns with Father because Mother had indicated that he was "a violent man," that she had been "a victim of domestic violence by [Father]," and that she "didn't allow [Opal] around [Father] because she was trying to keep [Opal] safe." The Department was also concerned because Father had previously been convicted of injury to a child. *See* Tex. Penal Code Ann. § 22.04(a)(3).

At the termination trial, the trial court admitted into evidence a certified copy of a "Judgment of Conviction by Jury," reflecting that on April 30, 2015, Father had been convicted of injury to a child for an offense that had occurred on June 1, 2011. The indictment included in this exhibit alleges that Father had intentionally or knowingly caused bodily injury to a child younger than fifteen years of age by "striking or hitting [the child] with a cord." An arrest affidavit that was admitted into evidence

---

[6]Cummings provided the following examples of threats made to her by Mother: "B****, meet me out back"; "Wait until I meet you in the f***ing alley"; "Why the f*** you talking to me, get the f*** out of my face, or else"; and "[Q]uit f***ing talking . . . or else."

6

at the termination trial reflects that a six-year-old girl had reported that Father had struck her with "a cord from the TV in her mom's room while her clothes were off." Photographs depicting the injuries sustained by the child during that incident were admitted at the termination trial.

Due to the Department's concerns, Cummings developed a service plan for Father. Cummings later testified that Father's service plan was the same as Mother's, except that Father was also required to participate in a Batterer's Intervention and Prevention Program (BIPP) and in a Trust-Based Relational Intervention (TBRI) program. Father complied with some, but not all, aspects of his service plan. Cummings testified that Father had completed parenting classes and had been engaging in TBRI, but he had not completed a drug and alcohol assessment, a psychological evaluation, individual counseling, or anger management.

As to stability and housing, Father lived out of state at the time of removal but moved to Texas around September 2023. In Texas, he first found housing at a homeless shelter for men. He later moved into housing obtained by his wife, Sharrell McMillian. Cummings stated that Father occasionally worked by cutting hair for people in his apartment complex and neighborhood, but she stated that he had not demonstrated any kind of stability in employment.

As to drug testing, Cummings indicated that Father had been "mostly compliant." In September 2023, however, Father had tested positive for marijuana.

Cummings testified that Father had not complied with an April 2024 request for drug testing because "he didn't feel like he needed to do a drug test."

Before he moved to Texas, but after Opal's removal, Father had visited with Opal virtually. Father had attended only three of eleven virtual visits. One of those visits had ended prematurely because Father had "rant[ed] about how CPS are parasites and vultures," "br[ought] up his past criminal history," and told Opal that the Department was "going to take her kids when she is older."[7] Cummings also said that during a visit with Opal, Father had "tr[ied] to educate her on marijuana and dispensaries." Given that Opal was nine years old at the time, Cummings did not think that the conversation was appropriate.

At the termination trial, Cameron Bryson, a police officer with the Fort Worth Police Department, testified that, on February 16, 2024, he was dispatched to a McDonald's restaurant because of a domestic disturbance. Bryson met with McMillian, who was Father's girlfriend at the time[8] and seven weeks pregnant. McMillian reported that she had been assaulted by Father on the previous day and

---

[7]While Father had negative things to say about the Department, he had positive things to say about Mother. Father stated that "[h]e didn't have concerns with [Mother]," that the Department "should not have ever removed [Opal] from [Mother]," that Mother "was not a bad mom," and that the Department "should give [Opal] back to [Mother]." This concerned Cummings because it indicated to her that Father did not see the need to be protective of Opal.

[8]Based on comments made by Father during his questioning of witnesses at the termination trial, it appears that Father married McMillian around three weeks after the domestic-disturbance call.

that Father had known that she was pregnant when he assaulted her. McMillian told Bryson that she had not reported the assault the previous day because it had taken her time to "gather her children to get away." In a "Victim Voluntary Statement" that was included in Bryson's police report and admitted into evidence at the termination trial, McMillian stated that Father had become mad at her during an argument; that Father had "smacked" her, "cho[k]ed" her, and "pu[n]ched" her in the face; and that he had dumped a trash can and a gallon of water on her.[9]

## D. Opal's Placement with Aunt Following Removal, Opal's Improvement Under Aunt's Care, and Aunt's Desire to Adopt Opal

Cummings testified that at the time of removal, Opal's behavior and social skills were "very delayed." Cummings stated that Opal "would often act like an animal," that she would move around the room "on all fours," and that she would "make sounds like an animal." Cummings also indicated that Opal's school attendance was inconsistent prior to removal and that Opal had significantly fallen behind in her education.

---

[9]At the termination trial, Father denied assaulting McMillian. He also pled the Fifth Amendment when asked questions regarding the police report pertaining to his alleged altercation with McMillian. *See In re E.S.*, No. 12-20-00282-CV, 2021 WL 2483788, at \*5 (Tex. App.—Tyler June 17, 2021, pet. denied) (mem. op.) ("In a civil case, including a termination of parental rights case, a fact finder may draw an adverse inference against a party who pleads the Fifth Amendment."); *In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at \*26 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.) (similar); *see also* Tex. R. Evid. 513(c).

Following removal, Opal was placed in the care of her maternal aunt, L.S. (Aunt).[10] Cummings testified that Opal was "doing really well" with Aunt and that Opal had bonded with Aunt and the other children in Aunt's home. Cummings stated that Opal had made progress with her education following removal and that, by the time of the termination trial, Opal was "on grade level." Cummings indicated that Aunt was active in getting Opal to her medical appointments and therapy sessions.[11] According to Cummings, Aunt was able to meet Opal's physical, emotional, and financial needs and would be able to meet those needs in the future. Cummings stated that the Department planned for Aunt to adopt Opal and that Aunt desired to do so.

### E. Procedural History

On November 2, 2022, the Department filed its petition seeking the termination of Mother's and Father's respective parental rights to Opal. In its petition, the Department sought termination of Mother's parental rights based on, among other things, the predicate termination grounds set forth in Subsections (D), (E), and (O) of Section 161.001(b)(1) of the Family Code. *See* Tex. Fam. Code Ann.

---

[10]During the pendency of the case, Mother provided the Department with the names of several other individuals who Mother thought could be possible placements for Opal. Those individuals were rejected as placements because they either had a "criminal history" or a "CPS history."

[11]Cummings testified that Opal had received behavior therapy, individual therapy, and play therapy.

§ 161.001(b)(1)(D), (E), (O). The Department sought termination of Father's parental rights based on, among other things, the predicate termination grounds set forth in Subsections (L) and (O) of Section 161.001(b)(1) of the Family Code. *Id.* § 161.001(b)(1)(L), (O).

The case was initially called for trial on September 6, 2023. Mother and Father both appeared at that setting pro se. The Department began its case-in-chief that day, and it called two witnesses to testify. In the middle of the second witness's testimony, a lengthy exchange took place between the trial court and Father regarding Father's pro se status and his previous firings of his two appointed attorneys. During that exchange, Father indicated that he wanted to hire an attorney. After expressing his indigency, Father stated that he desired for one of his previously fired attorneys to be reappointed to represent him. The trial court reappointed the attorney, and it recessed the trial to November 10, 2023.

The parties appeared before the trial court on that date, at what is referred to in the record as a "Motions Hearing." Father was represented by counsel at that hearing, while Mother appeared pro se. During that hearing, Mother indicated that she wanted to have an attorney appointed to represent her. After considering Mother's indigent status, the trial court stated that Mother was entitled to an attorney, and it appointed an attorney to represent her. The trial court stated that it might need to declare a mistrial so that Mother's attorney could prepare for and participate in the trial from the beginning.

11

On November 30, 2023, the trial court signed an "Order Extending Rendering of Final Order and Resetting the Continuation of Final Trial Date," in which the trial court ordered that the trial begun on September 6, 2023, would be continued on January 26, 2024.[12] On January 19, 2024, the trial court signed another "Order Extending Rendering of Final Order and Resetting the Continuation of Final Trial Date." In that order, the trial court ordered that the continuation of the trial be reset to February 12, 2024.

On February 12, 2024, the parties appeared for trial. At the start of that setting, the Department orally moved for a mistrial, arguing that it was warranted because Mother and Father had both appeared pro se when the trial had started on September 6, 2023, but that Mother and Father were subsequently represented by counsel.[13] Mother's counsel agreed with the Department's argument for mistrial, while Father objected. The trial court ultimately granted the Department's oral motion for mistrial. After the trial court granted the mistrial, it asked Father if he would like to start the new trial and begin his case-in-chief. The trial court stated that it would allow Father to "speak for a few minutes." Father then testified in a lengthy

---

[12]The order mistakenly gives the wrong year for the reset trial date, stating that the trial was to "now be set on Jan. 26, 2023."

[13]At the February 12, 2024 trial setting, the trial court granted a motion to withdraw urged by Father's counsel. Father told the trial court that he did not want to have another attorney appointed to represent him. Father also objected to the appointment of standby counsel and consulting counsel.

12

narrative fashion, discussing his past mistakes, his move to Texas (ostensibly so that he would not lose his parental rights to Opal), and steps he had taken to complete his services.[14]  After Father spoke, the trial court reiterated that it had granted a mistrial and that it would be resetting the trial.  On May 3, 2024, the trial court signed an "Order Granting New Trial," and it stated that the case was "hereby set for a [t]rial on the [m]erits on June 20, 2024."

The final termination trial took place on June 17, 2024.  Following the trial, the trial court signed an order finding that Mother had engaged in conduct under Subsections (D), (E), and (O) of Family Code Section 161.001(b)(1) and that termination of her parental rights was in Opal's best interest.  The trial court also found that Father had engaged in conduct under Subsections (L) and (O) of Family Code Section 161.001(b)(1) and that termination of his parental rights was in Opal's best interest.

## III. DISCUSSION

### A.  Mother's and Father's Complaints Pursuant to Family Code Section 263.4011

In their respective first issues, Mother and Father complain that the trial court violated Family Code Section 263.4011 by not rendering a final order within the

---

[14]Father's testimony on February 12, 2024, spanned five pages of the reporter's record.

13

ninetieth day after the date the trial commenced and by improperly extending the ninety-day period.[15] We will discuss these issues together.

### 1. Applicable Law

Pursuant to Section 263.4011(a), upon timely commencement of a trial on the merits like the one here, "the court shall render a final order not later than the 90th day after the date the trial commences." Tex. Fam. Code Ann. § 263.4011(a); *see id.* § 263.401. "The 90-day period for rendering a final order under Subsection (a) is not tolled for any recess during the trial." *Id.* § 263.4011(b). But the trial court "may extend the 90-day period under Subsection (a) for the period the court determines necessary if, after a hearing, the court finds good cause for the extension." *Id.* § 263.4011(c). If the trial court grants a good-cause extension, it "shall render a written order" that specifies "the grounds on which the extension is granted" and "the length of the extension." *Id.* Notably, Section 263.4011(d) provides the remedy for a trial court's failure to render a final order within the ninety-day period: "A party may file a mandamus proceeding if the court fails to render a final order within the time required by this section." *Id.* § 263.4011(d).

_____

[15]Specifically, Mother argues that "[t]he trial court erred in failing to properly extend the rendering of a final trial order beyond the statutory deadline under 263.4011 when it granted a mistrial on February 12th, allowed Father to put on his case in [c]hief, and continued the trial to June 17th." Citing Section 263.4011, Father specifically argues that "[t]he trial court committed harmful error in extending the trial date beyond the statutory deadline."

14

## 2. Analysis

We will assume, without deciding, that Mother and Father have preserved their respective complaints regarding this issue and that the trial court's termination order was signed more than ninety days after the termination trial had commenced. The issue then turns on the question of the appropriate remedy for a trial court's failure to comply with Section 263.4011. Mother and Father both argue that mandamus is not the appropriate remedy, with both contending that reversal of the trial court's termination order is instead the appropriate remedy. In making that argument, Mother and Father seem to suggest that the trial court's purported failure to comply with Section 263.4011 deprived it of jurisdiction to sign the termination order.

Two of our sister courts have recently addressed this issue. *See In re T.D.*, No. 04-24-00185-CV, 2024 WL 4177965 (Tex. App.—San Antonio Sept. 13, 2024, no pet.) (mem. op.); *In re G.L.J.*, No. 05-23-01296-CV, 2024 WL 2513311 (Tex. App.—Dallas May 24, 2024, no pet.) (mem. op.).

In *G.L.J.*, a mother argued that the trial court lacked jurisdiction to enter its termination order because the order was entered more than ninety days after the trial had commenced in violation of Section 263.4011. 2024 WL 2513311, at *5. The Department argued that the mother had waived that issue for appeal because she had not raised it in the trial court. *Id.* at *5–6. The Dallas Court of Appeals agreed with the Department. *Id.* at *5. In reaching that conclusion, the court held that "the requirement to enter an order within ninety days of trial is not jurisdictional." *Id.* The

15

court stated that "the text of [Section 263.4011] reveals the opposite," pointing out that under Section 263.4011(d), "a party may initiate a 'mandamus proceeding' to challenge the trial court's failure to issue an order within the time prescribed by subsection (a)." *Id.* "By authorizing parties to 'file a mandamus proceeding' in subsection (d), the Legislature contemplated that a court of appeals may enter an order directing the trial court to issue the final order that the trial court failed to enter within the time limit prescribed by subsection (a)." *Id.* at *6 (citing Tex. Fam. Code Ann. § 263.4011(d)). Because the mother had not raised that issue with the trial court and because Section 263.4011 is not jurisdictional, the Dallas Court of Appeals held that the mother had waived the issue on appeal. *Id.*

In *T.D.*, a father argued that he was entitled to a new trial because the trial court had not rendered its termination order within ninety days after the date the trial had commenced. 2024 WL 4177965, at *7. The San Antonio Court of Appeals rejected that argument for two reasons. *Id.* at *8. First, the court noted that "when a trial court fails to timely render a final order, the statute provides a party's remedy is through writ of mandamus, not reversal for a new trial on direct appeal." *Id.* (citing Tex. Fam. Code Ann. § 263.4011(d)). The court stated that the father "could have filed a mandamus . . . if he wanted to compel the trial court to rule within ninety days of the date the trial commenced" but that he "did not do so." *Id.* The court noted that the father had not directed it to any authority, nor had it found any, standing for the proposition that he was entitled to a new trial based on the trial court's failure to

16

comply with Section 263.4011.[16]  *Id.*  Second, the court cited favorably to *G.L.J.* and agreed with its reasoning and conclusion that "the requirement to render an order within ninety days of the date trial commenced is not jurisdictional."  *Id.*  Accordingly, the court held that the father had failed to preserve his complaint on appeal by not timely raising it in the trial court.  *Id.*

We agree with the conclusions and reasoning of our sister courts in *T.D.* and *G.L.J.* regarding this issue.  We hold that Section 263.4011(a)'s requirement to render an order within ninety days of the date the trial commenced is not jurisdictional.  *See T.D.*, 2024 WL 4177965, at *8; *G.L.J.*, 2024 WL 2513311, at *5; *see also* Tex. Fam. Code Ann. § 263.4011(a).  And, we hold that the remedy suggested by Mother and Father for a violation of Section 263.4011—reversal of the termination order—is at odds with the specific remedy of mandamus contemplated by Section 263.4011(d).  *See T.D.*, 2024 WL 4177965, at *8; *G.L.J.*, 2024 WL 2513311, at *5; *see also* Tex. Fam. Code Ann. § 263.4011(d).  If Mother or Father had wished to complain about the trial court's alleged violation of Section 263.4011(a), they could have filed a petition for mandamus in our court.  They did not do so, and they are not entitled to a reversal of the trial court's termination order for the alleged violation.  *See T.D.*, 2024 WL

---

[16]Here, Mother and Father have similarly not provided us with any authority for the proposition that a violation of Section 263.4011 warrants a new trial.  And, we have found none.

4177965, at \*8; *G.L.J.*, 2024 WL 2513311, at \*5.  We overrule Mother's first point and Father's first point.

## B.  Mother's and Father's Predicate-Ground Complaints

In her second through fourth points, Mother argues that the evidence is legally and factually insufficient to support termination under Family Code Subsections 161.001(b)(1)(D), (E), and (O).[17]  Similarly, in his second and third points, Father argues that the evidence is legally and factually insufficient to support termination under Family Code Subsections 161.001(b)(1)(L) and (O).

### 1.  Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence:  (1) that the parent's actions satisfy at least one predicate ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest.  Tex. Fam. Code Ann. § 161.001(b); *In re C.E.*, 687 S.W.3d 304, 308 (Tex. 2024).  Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code Ann. § 101.007; *C.E.*, 687 S.W.3d at 308.

---

[17]With respect to her fourth point—the challenge based on Subsection 161.001(b)(1)(O)—Mother only argues factual insufficiency.

18

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged findings to determine whether a reasonable factfinder could form a firm belief or conviction that the Department proved the finding. *C.E.*, 687 S.W.3d at 308. We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See C.E.*, 687 S.W.3d at 308; *J.P.B.*, 180 S.W.3d at 573. The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm belief or conviction that the Department proved the predicate grounds. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (L), (O); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the

factfinder could reasonably form such a firm belief or conviction, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

### 2. Mother's Complaint

We turn to Mother's second and third points, in which she argues that the evidence is legally and factually insufficient to support termination under Family Code Subsections 161.001(b)(1)(D) and (E).

### a. Applicable Law

Subsections (D) and (E) provide that the trial court may order the termination of a parent's rights if it finds by clear and convincing evidence that the parent has

(D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]

(E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

"Endanger" means to expose to loss or injury, to jeopardize. *In re R.R.A.*, 687 S.W.3d 269, 277 (Tex. 2024) (citing *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). To terminate a parent's rights for endangerment under Subsections (D) or (E), the parent's conduct need not be directed at the child, nor must the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from the parental misconduct standing alone. *In re H.C.*, No. 02-23-00477-CV, 2024 WL 1561513, at *5 (Tex. App.—Fort Worth Apr. 11,

20

2024, no pet.) (mem. op.); *In re M.R.*, No. 02-19-00212-CV, 2019 WL 6606167, at *7 (Tex. App.—Fort Worth Dec. 5, 2019, no pet.) (mem. op.).

Generally, the relevant time frame for evaluating endangerment under Subsection (D) is before the child's removal. *In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022). A single act or omission can support termination under Subsection (D). *In re B.U.*, No. 02-23-00150-CV, 2023 WL 5967604, at *3 (Tex. App.—Fort Worth Sept. 14, 2023, pet. denied) (mem. op.); *In re M.G.*, No. 02-23-00074-CV, 2023 WL 4008687, at *6 (Tex. App.—Fort Worth June 15, 2023, pet. denied) (mem. op.). "The suitability of a child's living conditions and the conduct of parents or others in the home are relevant to a Subsection (D) inquiry." *J.W.*, 645 S.W.3d at 749. Abusive or violent conduct by a parent or other resident of a child's home may produce an endangering environment for a child. *M.G.*, 2023 WL 4008687, at *6; *see In re J.V.*, No. 02-15-00036-CV, 2015 WL 4148500, at *3 (Tex. App.—Fort Worth July 9, 2015, no pet.) (mem. op.) ("Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in [her] home is a part of the 'conditions or surroundings' of the child's home under section 161.001(b)(1)(D)."). Illegal drug use and drug-related criminal activity by the parent or caregiver supports the conclusion that the child's surroundings endanger her physical or emotional well-being. *In re A.M.*, No. 02-19-00023-CV, 2019 WL 3334420, at *8 (Tex. App.—Fort Worth July 25, 2019, no pet.) (mem. op.); *J.V.*, 2015 WL 4148500, at *3.

In contrast, termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re K.J.*, No. 02-23-00198-CV, 2023 WL 6475930, at *14 (Tex. App.—Fort Worth Oct. 5, 2023, pet. denied) (mem. op.); *In re D.A.*, No. 02-22-00260-CV, 2022 WL 17841133, at *7 (Tex. App.—Fort Worth Dec. 22, 2022, pet. denied) (mem. op.). The endangering conduct under Subsection (E) need not be directed at the child, nor must the child actually suffer injury. *In re J.F.-G*, 627 S.W.3d 304, 312 (Tex. 2021); *D.A.*, 2022 WL 17841133, at *7. And, unlike Subsection (D), the relevant time frame is not limited to before the child's removal. In analyzing endangerment under Subsection (E), a trial court "may consider actions before the child's birth, actions while the child is not in the parent's presence, and actions while the child is in the Department's custody." *In re L.T.*, No. 02-22-00197-CV, 2022 WL 15053329, at *4 (Tex. App.—Fort Worth Oct. 27, 2022, no pet.) (mem. op.); *see K.J.*, 2023 WL 6475930, at *14.

"Generally, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *D.A.*, 2022 WL 17841133, at *7 (citing *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g)). Illegal drug use may establish an endangering course of conduct because drugs can impair or incapacitate the user's ability to parent. *In re N.T.*, No. 02-24-00067-CV, 2024 WL 2066375, at *4 (Tex. App.—Fort Worth May 9, 2024, no pet.) (mem. op.); *D.A.*, 2022 WL 17841133, at *7. Moreover, "[a] parent's decision

22

to use illegal drugs during the pendency of a termination suit, when the parent's parental rights are in jeopardy, demonstrates a voluntary, deliberate, and conscious course of conduct that endangers a child's well-being." *H.C.*, 2024 WL 1561513, at *5. Similarly, a pattern of violent or volatile behavior can pose a risk of physical and emotional danger to a child. *N.T.*, 2024 WL 2066375, at *4; *see In re E.T.*, No. 02-22-00299-CV, 2022 WL 17172492, at *4–6 (Tex. App.—Fort Worth Nov. 23, 2022, no pet.) (mem. op.).

### b. Analysis

Because the evidence pertaining to Subsections (D) and (E) is interrelated, we conduct a consolidated review of those subsections. *See In re N.H.*, No. 02-22-00157-CV, 2022 WL 4374638, at *10 (Tex. App.—Fort Worth Sept. 22, 2022, no pet.) (mem. op.); *In re U.L.*, No. 02-21-00218-CV, 2021 WL 5227087, at *5 (Tex. App.—Fort Worth Nov. 10, 2021, pet. denied) (mem. op.).

Here, the record reflects that Opal came into the Department's care after Mother had left her with a drug user. Opal told a Department investigator about prior occasions when Mother had left her alone "from light to dark" and in which a domestic-violence incident had occurred between Mother and a man that resulted in broken televisions and a "trashed" room. At the time of removal, Opal's appearance was "very rough." According to a Department investigator who saw Opal at the time of removal, Opal had dry skin, messy hair, a dirty appearance, ill-fitting clothes, scars and marks on her body, and labored breathing. Such pre-removal evidence of neglect

23

supports both of the trial court's endangerment findings. *See In re M.T.*, No. 02-22-00111-CV, 2022 WL 2353095, at *5 (Tex. App.—Fort Worth June 30, 2022, no pet.) (mem. op.) ("Allowing children to live in unsanitary conditions and neglecting their physical condition supports a finding that the parent has endangered the children's physical and emotional well-being."); *In re M.A.A.*, No. 01-20-00709-CV, 2021 WL 1134308, at *17 (Tex. App.—Houston [1st Dist.] Mar. 25, 2021, no pet.) (mem. op.) ("[P]arental neglect can be as dangerous to the children's well-being as direct abuse and neglecting the children's physical condition constitutes endangerment.").

The record further reflects that Mother had drug problems after Opal's removal. In May 2023, she tested positive for amphetamine, methamphetamine, and marijuana. She also refused the Department's requests for drug testing from November 2022 until the May 2023 test, and she did not submit to any drug testing after the May 2023 test. *See J.T.G.*, 121 S.W.3d at 131 (holding that factfinder "could have reasonably inferred that [father's] failure to complete the scheduled drug screens indicated he was avoiding testing because he was using drugs"); *In re A.C.*, No. 02-22-00321-CV, 2022 WL 18461861, at *7 (Tex. App.—Fort Worth Jan. 26, 2022, no pet.) (mem. op.) (holding that trial court may infer that parent was using drugs based on parent's refusal to submit to drug testing); *In re B.H.*, No. 02-21-00233-CV, 2022 WL 60739, at *7 (Tex. App.—Fort Worth Jan. 6, 2022, pet. denied) (mem. op.) (concluding that parents had "presumed-positive drug-test results because they had refused to be tested"). Additionally, Mother was arrested during the pendency of the

24

case "for a possession charge." Such evidence of Mother's drug use supports the trial court's Subsection (E) endangerment finding. *See N.T.*, 2024 WL 2066375, at *4 ("Drug use can be endangering because it can impair or incapacitate the user's ability to parent, and a parent's drug use is particularly concerning . . . if the parent decides to continue using drugs even when the parent–child relationship is in jeopardy." (citation omitted)).

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold that there is some evidence of an endangering environment from which a reasonable factfinder could have formed a firm belief or conviction that Mother had knowingly placed or had knowingly allowed Opal to remain in conditions or surroundings that endangered her emotional or physical well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D). And, we hold that there is some evidence of endangering conduct from which a reasonable factfinder could have formed a firm belief or conviction that Mother had engaged in conduct that endangered Opal's physical or emotional well-being. *See id.* § 161.001(b)(1)(E). In other words, the evidence is legally sufficient.

As for factual sufficiency, giving due deference to the factfinder's Subsection (D) and Subsection (E) findings, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a factfinder could reasonably form a firm belief or conviction that Mother had knowingly placed or had

25

knowingly allowed Opal to remain in conditions or surroundings that endangered her emotional or physical well-being and that Mother had engaged in conduct that endangered her physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E). We thus overrule Mother's second and third points.

Because we hold that the evidence is legally and factually sufficient to support the endangerment findings under Subsections 161.001(b)(1)(D) and (E), and because only one predicate finding is necessary to sustain a parental-rights termination, we need not address Mother's challenge to the trial court's finding under Subsection 161.001(b)(1)(O) that she had failed to comply with her court-ordered service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1); *C.E.*, 687 S.W.3d at 308; *see also* Tex. R. App. P. 47.1. We therefore do not address Mother's fourth point.

### 3. Father's Complaint

In his second and third points, Father argues that the evidence is legally and factually insufficient to support the trial court's termination of his parental rights under Family Code Subsections 161.001(b)(1)(L) and (O). We will begin by addressing his complaint regarding the trial court's finding under Subsection (L).

#### a. Applicable Law

Family Code Subsection 161.001(b)(1)(L) provides that a trial court may order termination of the parent–child relationship if the court finds by clear and convincing evidence that the parent has

26

been convicted or has been placed on community supervision, including deferred adjudication community supervision, for being criminally responsible for the death or serious injury of a child under the following sections of the Penal Code, or under a law of another jurisdiction that contains elements that are substantially similar to the elements of an offense under one of the following Penal Code sections, or adjudicated under Title 3 for conduct that caused the death or serious injury of a child and that would constitute a violation of one of the following Penal Code sections:

. . . .

(ix) Section 22.04 (injury to a child, elderly individual, or disabled individual)[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(L); *see In re Z.N.*, 602 S.W.3d 541, 545–49 (Tex. 2020).

Thus, under Subsection (L), termination is permissible only if (1) the parent has committed acts constituting a violation of one of the statutorily enumerated crimes listed in the subsection; (2) the parent's guilt for committing the crime has been adjudicated or the adjudication of that guilt has been deferred; and (3) the parent, in committing the acts that underlie the crime, was responsible for a child's death or serious injury. *In re Z.W.*, No. 02-18-00190-CV, 2018 WL 4354404, at *10 (Tex. App.—Fort Worth Sept. 13, 2018, no pet.) (mem. op.); *see Z.N.*, 602 S.W.3d at 545.

As we previously noted in *Z.W.*,

The [F]amily [C]ode does not define "serious injury," so we give it its ordinary meaning. *See* Tex. Gov't Code Ann. § 312.002[]; *In re A.L.*, 389 S.W.3d 896, 900–01 (Tex. App.—Houston [14th Dist.] 2012, no pet.). "Serious" means "having important or dangerous possible consequences," while "injury" means "hurt, damage, or loss sustained." *A.L.*, 389 S.W.3d at 901. Demonstrating "serious injury" to a child

27

under [S]ubsection (L) does not require a showing of "serious bodily injury" as defined in the [P]enal [C]ode. *Id.* Moreover, the Texas Supreme Court disavowed the suggestion that molestation or indecency with a child generally does not cause serious injury, thus intimating that psychological or emotional injuries are relevant when determining whether a child has sustained "serious injury" for purposes of [S]ubsection (L). *See In re L.S.R.*, 92 S.W.3d 529, 530 (Tex. 2002).

2018 WL 4354404, at *10.

### b. Analysis

Here, the trial court admitted into evidence a certified copy of Father's conviction for injury to a child younger than fifteen years of age.[18] *See* Tex. Penal Code Ann. § 22.04(a)(3). Included within that exhibit was an indictment alleging that Father had intentionally or knowingly caused bodily injury to a child younger than fifteen years of age by "striking or hitting [the child] with a cord." Also included in that exhibit was an arrest affidavit. In the arrest affidavit, the peace officer declares that a six-year-old girl had reported that Father had struck her with "a cord from the TV in her mom's room while her clothes were off." Photographs depicting the girl's injuries were admitted into evidence at the termination trial. Those photographs show multiple curved marks across the girl's back and side.

In his brief, Father argues that the Department did not prove that he had inflicted "serious bodily injury" on the girl as that term is defined in the Penal Code. But as we already noted, we and other Texas courts have previously rejected the

---

[18]Father did not object to the admission of that exhibit.

28

argument that a showing of "serious bodily injury" is required by Subsection (L). *See Z.W.*, 2018 WL 4354404, at *10 (stating that Subsection (L) does not require a showing of "serious bodily injury"); *In re A.L.*, 389 S.W.3d 896, 901 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ("We conclude [that] demonstrating 'serious injury' to a child under [S]ubsection (L) does not require a showing of 'serious bodily injury' as defined in the Penal Code."); *C.H. v. Dep't of Fam. & Protective Servs.*, No. 01-11-00385-CV, 2012 WL 586972, at *5 (Tex. App.—Houston [1st Dist.] Feb. 23, 2012, pet. denied) (mem. op.) ("Appellant's assertion that the Department was required to show that [the child] suffered 'serious bodily injury' as defined in the Penal Code finds no support in the law."). All that is required is a showing of a "serious injury"—a showing of a "hurt, damage, or loss sustained" that has "important or dangerous possible consequences." *Z.W.*, 2018 WL 4354404, at *10; *A.L.*, 389 S.W.3d at 901; *see* Tex. Fam. Code Ann. § 161.001(b)(1)(L); *see also Z.N.*, 602 S.W.3d at 547 ("We hold that, under [S]ection 161.001(b)(1)(L)(iv), a parent's conviction for indecency with a child can constitute legally sufficient evidence that the parent was 'criminally responsible' for the 'serious injury of a child.'").

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold that there is some evidence, i.e., legally sufficient evidence, on which a reasonable factfinder could have formed a firm belief or conviction that Father, in committing the act of causing injury to a child, was

29

responsible for causing serious injury to the child. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(L); *C.H.*, 2012 WL 586972, at *6–7 (holding that evidence was sufficient to support Subsection (L) finding when affidavit was admitted into evidence showing that appellant had beat a child with a belt and the child had "belt marks head-to-toe").

And, giving due deference to the factfinder's Subsection (L) finding, without supplanting the factfinder's judgment with our own, and after reviewing the factual sufficiency in light of the entire record, we hold that a factfinder could reasonably form a firm belief or conviction that Father, in committing the act of causing bodily injury to a child, was responsible for causing serious injury to the child. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(L); *C.H.*, 2012 WL 586972, at *6–7. We thus overrule Father's third point.

Because we hold that the evidence is legally and factually sufficient to support the trial court's finding under Subsection 161.001(b)(1)(L), and because only one predicate finding is necessary to sustain a parental-rights termination, we need not address Father's challenge to the trial court's finding under Subsection 161.001(b)(1)(O) that he had failed to comply with his court-ordered service plan. *See* Tex. Fam. Code Ann. § 161.001(b)(1); *C.E.*, 687 S.W.3d at 308; *see also* Tex. R. App. P. 47.1. We therefore do not address Father's second point.

## C. Mother's Best-Interest Complaint

In her fifth point, Mother argues that the evidence is legally and factually insufficient to support the trial court's best-interest finding.

### 1. Standard of Review and Applicable Law

We review Mother's challenge to the sufficiency of the trial court's best-interest finding under the same review standards stated above regarding the predicate grounds under Section 161.001(b)(1). Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence that is probative of the predicate grounds under Section 161.001(b)(1) may also be probative of best interest under Section 161.001(b)(2). *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28. We further consider the evidence in light of the following nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

31

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re Z.G.*, No. 02-23-00038-CV, 2023 WL 3521848, at *4 (Tex. App.—Fort Worth May 18, 2023, pet. denied) (mem. op.); *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at *7 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.).

### 2. Analysis

#### a. Opal's Desires

As to Opal's desires, she did not testify at the termination trial, and there is no evidence in the record of her desires regarding the termination of Mother's parental rights. We conclude that this factor is neutral and does not weigh against or in favor of the trial court's best-interest finding. *See In re J.R.*, No. 02-18-00317-CV, 2019 WL 237740, at *10 (Tex. App.—Fort Worth Jan. 17, 2019, pet. denied) (mem. op.)

32

(holding that "this factor weighed neither for nor against" termination of parent's parental rights when child did not testify at trial, there was no evidence in the record regarding child's desired placement, and record reflected that child was bonded with both parent and foster parents).

### b. Opal's Emotional and Physical Needs and Danger Now and in the Future

As to Opal's emotional and physical needs now and in the future and the emotional and physical danger to her now and in the future, the record reflects that Mother had left Opal home alone "from light to dark," had been in a domestic-violence incident with a man in Opal's presence in which "televisions were broken" and "the room was trashed," and had left Opal in the care of a drug user. The care that Opal received from Mother and that drug user was lacking—upon removal, Opal was in a "very rough" state, as we have repeatedly noted. Such evidence demonstrates that Mother has endangered Opal's emotional and physical needs and posed a danger to her. *See In re J.S.*, 687 S.W.3d 541, 554 (Tex. App.—Eastland 2024, no pet.) (holding that trial court properly found that it was in the children's best interest "to have sober and drug-free caregivers"); *In re S.A.*, No. 04-17-00571-CV, 2018 WL 521626, at *4 (Tex. App.—San Antonio Jan. 24, 2018, no pet.) (mem. op.) ("Evidence of domestic violence in the home supports a trial court's best-interest finding.").

Furthermore, Opal's removal did not serve as a wake-up call to Mother. Mother seemed to minimize Opal's removal, telling Cummings that she did not think

that she needed to complete her service plan because she did not have anything to do with Opal's removal. Mother also tested positive for amphetamine, methamphetamine, and marijuana during a May 2023 drug test, and Mother refused the Department's requests for drug testing apart from the May 2023 test. Mother was also arrested during the pendency of the case "for a possession charge." Such evidence of drug use and a refusal to submit to drug testing is yet another demonstration that Mother has endangered Opal's emotional and physical needs and posed a danger to her. *See Z.G.*, 2023 WL 3521848, at *4 (conducting best-interest analysis and noting that parent's drug use and refusal to submit to drug testing supported termination); *L.T.*, 2022 WL 15053329, at *7 (similar). And, as to future drug use, a factfinder may measure a parent's future conduct by her past conduct. *In re A.H.*, No. 02-21-00402-CV, 2022 WL 1682422, at *11 (Tex. App.—Fort Worth May 26, 2022, no pet.) (mem. op.); *In re R.H.*, No. 02-19-00273-CV, 2019 WL 6767804, at *5 (Tex. App.—Fort Worth Dec. 12, 2019, pet. denied) (mem. op.). The trial court was entitled to weigh these factors in favor of terminating Mother's parental rights to Opal.

### c. Parental Abilities of the Individuals Seeking Custody

As to the parental abilities of the individuals seeking custody, again, the record reflects that Mother had left Opal home alone "from light to dark," had left her in the care of a drug user, was herself a drug user, and that Opal was in a "very rough" state upon removal. The record further reflects that Opal's school attendance was

34

inconsistent while in Mother's care, and Opal's education was significantly delayed.  In contrast, Opal was "doing really well" in Aunt's care, and she had made progress with her education to the point that she was "on grade level."   There was testimony confirming that Aunt was meeting Opal's physical, emotional, and financial needs.  The trial court was entitled to weigh this factor in favor of terminating Mother's parental rights to Opal.  *See In re M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *19 (Tex. App.—Fort Worth June 28, 2021, pet. denied) (mem. op. on reh'g) (holding that this factor supported termination when foster parents had effectively parented the child while mother had demonstrated an inability to parent the child); *In re J.A.C.*, No. 13-12-00674-CV, 2013 WL 1283901, at *4 (Tex. App.—Corpus Christi–Edinburg Mar. 28, 2013, no pet.) (mem. op.) (holding that mother's parenting abilities were compromised by her drug problems).

### d.  Programs Available to Promote Opal's Best Interest

As to the programs available to assist Mother in promoting Opal's best interest, the record reflects that Mother completed a parenting class, an anger management class, and a psychological evaluation, as required by her service plan.  Mother did not complete, however, the mental health assessment, drug and alcohol assessment, or individual counseling required by her service plan.  "The factfinder can infer from a parent's failure to take the initiative to utilize programs offered by the Department that the parent did not have the ability to be motivated to seek out available resources

35

needed now or in the future." *In re S.B.*, 597 S.W.3d 571, 587 (Tex. App.—Amarillo 2020, pet. denied).

Moreover, Cummings stated that she did not think that Mother was able to control her behavior despite the completion of the anger management class, noting that Mother had threatened her on multiple occasions. *See In re P.P.-S.*, No. 02-23-00309-CV, 2024 WL 123654, at *8 (Tex. App.—Fort Worth Jan. 11, 2024, no pet.) (mem. op.) ("While Mother completed some of her services, she did not accomplish the intended goal of those services."). Mother also tested positive for drugs during the pendency of the case and refused to submit to drug testing requested by the Department. The trial court was entitled to weigh this factor in favor of terminating Mother's parental rights to Opal. *See In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (holding that this factor weighed against parent who had completed some of the Department's service plan but had continued using drugs and had not completed the entire plan).

### e. Plans for Opal

As to the plans for Opal, Mother did not articulate any plan for Opal at trial.[19] In contrast, the Department put on testimony that Aunt desired to adopt Opal. The trial court was entitled to weigh this factor in favor of terminating Mother's parental rights to Opal. *See T.D.*, 2022 WL 11483054, at *10 (holding that this factor weighed

---

[19]Mother did not testify at trial.

36

in favor of termination when parent did not articulate any plan for child at trial, but Department put on testimony that foster parents desired to adopt child).

### f. Stability of the Home or Proposed Placement

As to the stability of the home or proposed placement, the record reflects that Mother was homeless during parts of this case and that she was not employed at the time of trial. In contrast, Cummings testified that Opal was doing well in Aunt's care; that Opal had bonded with Aunt and the other children in Aunt's home; and that Aunt was meeting Opal's physical, emotional, and financial needs and would be able to meet those needs in the future. The trial court was entitled to weigh this factor in favor of terminating Mother's parental rights to Opal. *See In re T.M.*, No. 02-22-00070-CV, 2022 WL 2527627, at *10 (Tex. App.—Fort Worth July 7, 2022, no pet.) (mem. op.) ("Given Mother's inability to obtain consistent employment, the trial court was entitled to find that Mother was unlikely to maintain stable housing after trial."); *In re K.C.*, No. 02-19-00293-CV, 2020 WL 370573, at *7 (Tex. App.—Fort Worth Jan. 23, 2020, no pet.) (mem. op.) (holding that this factor supported termination when foster parents "took care . . . of and always provided for" children and father was "not currently able to provide a stable home").

### g. Acts or Omissions Indicating That the Parent–Child Relationship is Improper

As to Mother's acts or omissions that may indicate that the existing parent–child relationship is not a proper one, once again, the record reflects that Opal was

removed after Mother had left her in the care of a drug user. Rather than allowing Opal's removal to serve as a catalyst for change, Mother herself tested positive for amphetamine, methamphetamine, and marijuana following removal. Mother also refused drug testing during the vast majority of the case, and she was arrested "for a possession charge." The trial court was entitled to weigh this factor in favor of terminating Mother's parental rights to Opal. *See T.M.*, 2022 WL 2527627, at *10 (holding that this factor weighed in favor of termination because parent used illegal drugs during the pendency of the Department's case); *see also J.V.*, 2015 WL 4148500, at *3 ("Parental and caregiver illegal drug use and drug-related criminal activity supports the conclusion that the children's surroundings endanger their physical or emotional well-being.").

### h. Mother's Excuses

As to Mother's excuses, if any, for her acts or omissions, Mother did not seem to take Opal's removal seriously, telling Cummings that she did not think that she needed to complete her service plan because she did not have anything to do with Opal's removal. Moreover, Mother did not offer any explanation for her failed drug test, nor did she offer any explanation for her noncompliance with drug testing. The trial court was entitled to weigh this factor in favor of terminating Mother's parental rights to Opal. *See In re A.H.*, No. 02-23-00348-CV, 2024 WL 191229, at *8 (Tex. App.—Fort Worth Jan. 18, 2024, pet. denied) (mem. op.) (holding that parent's failure to offer any explanation for noncompliance with random drug testing was a factor

trial court could have considered in favor of termination as part of best-interest determination); *Z.G.*, 2023 WL 3521848, at *5 (similar); *In re J.J.*, No. 14-19-00622-CV, 2020 WL 428859, at *9 (Tex. App.—Houston [14th Dist.] Jan. 28, 2020, pet. denied) (mem. op.) (holding that this factor supported termination when mother "attempted to minimize or discredit evidence of her misconduct").

### 3. Best-Interest Conclusion

Viewing the evidence in the light most favorable to the trial court's best-interest finding, we hold that the trial court could have reasonably formed a firm belief or conviction that termination of the parent–child relationship between Mother and Opal was in Opal's best interest, and we therefore hold that the evidence is legally sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. Additionally, based on our exacting review of the entire record and giving due deference to the trial court's credibility determinations, we likewise conclude that the evidence is factually sufficient to support the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 18–19. Accordingly, we overrule Mother's fifth point.

### IV. CONCLUSION

Having overruled Mother's and Father's dispositive issues, we affirm the trial court's termination order.

39

/s/ Dana Womack

Dana Womack
Justice

Delivered: November 14, 2024